Edward JARECKI et al.,
Plaintiffs-Appellants,

v.

UNITED STATES et al.,
Defendants-Appellees.

No. 78-1320.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1978.

Decided Jan. 9, 1979.

Rehearing and Rehearing En Banc
Denied Feb. 23, 1979.

672

Kenneth L. Cunniff, Chicago, Ill., for plaintiffs-appellants.

Gabriel N. Steinberg, Asst. U. S. Atty., Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, WISDOM * and PELL, Circuit Judges.

WISDOM, Circuit Judge.

Three uniformed civilian guards, who were denied appointment to the Federal Protective Service (FPS), brought this suit against the United States and against the regional directors of the General Services Administration (GSA) and the Civil Service

---

* The Honorable John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

Commission for the Chicago area. In the complaint and on appeal, the plaintiffs pursued two separate courses. They challenged, in Count I of the complaint, the legality of the FPS. In Count II, they alleged that the government's refusal to reclassify them as Federal Protective Officers was an abuse of discretion. The district court dismissed the complaint for lack of subject matter jurisdiction and failure to state a claim on which relief can be granted. We affirm the district court's dismissal of Count I; we also affirm the dismissal of Count II but on the alternative ground that the plaintiffs have not exhausted available administrative remedies.

## I.

According to the complaint, the GSA employed for many years uniformed civilian guards as special police to protect federal buildings under its control. When these buildings became a target of terrorist activity, the GSA thought it necessary to employ federal officers capable of doing more hazardous protective work than was expected of the uniformed guards. In 1971, the GSA created the Federal Protective Service to meet this need. FPS officers were required to pass a training course in various aspects of police work, including the use of firearms and the detection of bombs, and were held to rigorous physical fitness standards. In turn, the officers were classified by the Civil Service Commission in the "police position" series and, as a result, they received higher GS grades than do uniformed guards. In addition, geographical pay adjustments are allocated from time to time to members of the police series.

The GSA continues to appoint uniformed guards to the FPS, but now it also recruits from outside sources. Moreover, the guards, like new applicants, must first pass an examination conducted by the Civil Service Commission which includes the training course in police work and a physical examination. The plaintiffs applied for appoint-

ment to the FPS in 1974. Although they successfully completed a month-long training course, both Mr. Martynowski and Mr. Swiatly failed the physical examination. According to the allegations in their complaint, they suffered from "diabetes, ulcers, overweight problems and various anatomical deformities". Mr. Jarecki refused to take the physical examination insisting that as a veteran, a status shared by the other plaintiffs, he is exempt from this requirement.

In their complaint, the plaintiffs asked the district court to grant two basically inconsistent forms of relief: either to order the GSA to abandon the FPS and revert to its pre-1971 practice of appointing only uniformed guards to act as special police or, instead, to order the GSA and Civil Service Commission to reclassify the uniformed guards as FPS officers. They also requested back pay, reflecting the difference between the salaries of guards and that of FPS officers, computed from the time the plaintiffs passed the training course.

## II.

We address first the plaintiffs' request for an order that would compel the GSA to draw all special police from the ranks of the uniformed guards. The plaintiffs contend that jurisdiction to grant this relief is conferred by the mandamus statute, 28 U.S.C. § 1361, which permits a federal court to compel an officer of the United States "to perform a duty owed to the plaintiff".[1] According to the plaintiffs, a statutory duty to appoint only uniformed guards is imposed upon the GSA by the Protection of Public Property Act, 40 U.S.C. § 318, which provides in part that:

> "The [General Services] Administrator . . . may appoint uniformed guards of said administration as special policemen without additional compensation for duty in connection with the policing of public buildings . . . Such special policemen shall have the same powers as sheriffs."

1. Section 1361 provides:

The district courts shall have original jurisdiction of any action in the nature of manda-

mus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

■ Mandamus is a powerful and unusual remedy that issues only in carefully circumscribed situations. It is traditionally available to compel a ministerial duty owed by the agency and then only when the statute defining that duty is "clear and free from doubt". *Smith v. Grimm,* 9th Cir. 1976, 534 F.2d 1346, 1352; *McClendon v. Blount,* 7th Cir. 1971, 452 F.2d 381, 383; *Hammond v. Hull,* 1942, 76 U.S.App.D.C. 301, 303, 131 F.2d 23, 25, *cert. denied,* 1943, 318 U.S. 777, 63 S.Ct. 830, 87 L.Ed. 1145. The language of the Protection of Property Act, however, is not mandatory. The statute does not, on its face, compel the appointment of uniformed guards as special police; it states that the GSA "may" appoint the guards at no additional compensation. Were we to adhere strictly to the traditional view of mandamus, our discussion would end with that observation.

The plaintiffs ask us, however, to consider the legislative history of Section 318 in determining whether there is a duty imposed by Section 318 that is subject to mandamus. Some courts have held that the need to construe a statute does not deprive the court of jurisdiction under Section 1361, acknowledging that a duty often becomes ministerial "only after a court has reached its own judgment about a disputed legal question and its application to a factual situation." *Seaton v. Texas Co.,* 1958, 103 U.S.App.D.C. 163, 168, 256 F.2d 718, 723, *quoted in Haneke v. Secretary of Health, Ed. & Welfare,* 1976, 175 U.S.App.D.C. 329, 334, 535 F.2d 1291, 1296 n.16. Commentators, too, urge that we break away from the "clear and free from doubt" standard, and

recognize that mandamus cases, like other suits for specific relief, present the question whether the administrative action complained of falls outside the scope of authority delegated to the executive department and is, therefore, subject to judicial control.[2] We shall look to the legislative history of Section 318, therefore, to see what light it throws on the question.

Before the enactment of Section 318, the Commissioner of Public Buildings was granted statutory authority to appoint federal employees as special policemen in the District of Columbia, 43 Stat. 175 (May 27, 1924) and outside the District during the period of national emergency. 56 Stat. 1000 (October 26, 1942). Formerly, the government had relied on state police to perform all necessary protective work in the area outside the District. It became apparent, however, that state police would often be unavailable or without jurisdiction to act on newly acquired federal property. Section 318, therefore, removed all limitations on the Commissioner's power to use federal officers. It also made clear that federal officers performing special protective duties were authorized to make arrests and must be recognized by courts as arresting officers. 1948 U.S.Cong. Service 1627.

■ The history amply supports the GSA's position that it has the power to establish the FPS. Whether the GSA exercises its authority by appointing employees to special police duties from time to time or by creating a permanent position for federal officers who act only as special police is immaterial.

---

2. *See, e. g.,* Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308 (1967); 3 K. Davis, Administrative Law Treatise, 23.11 (1958). *See also* Note, Mandamus in Administrative Actions: *Current Approaches,* 1973 Duke L.J. 207 (1973).

The reluctance of courts to interpret an ambiguous statute stemmed from the concept that writs of mandamus should not be used by federal courts of limited jurisdiction as substitutes for legislative authority to review administrative action. *See* Developments in the Law— Remedies Against the United States and its

Officials, 70 Harv.L.Rev. 829, 849 (1957). This position is no longer tenable. Congress recently removed the major impediments to judicial review of administrative action in suits for specific relief by eliminating the amount in controversy requirement in suits against federal officers brought under 28 U.S.C. § 1331(a) and by waiving sovereign immunity in the Administrative Procedure Act, 5 U.S.C. § 702, when nonmonetary relief from agency action is requested. Act of Oct. 21, 1976, Pub.L.No. 94–574, § 2, 90 Stat. 2721. As a result, § 1361 rarely supplies the only basis for a reviewing court's jurisdiction today.

The more serious contention of the plaintiffs is that Congress deprived the GSA of all elements of choice in selecting the personnel of the FPS when it enacted Section 318. The version of the bill presented to the House of Representatives contained no references to uniformed guards and, indeed, the 1942 statute on which Section 318 was modeled granted authority to appoint federal "employees". The bill was amended in the Senate, however, "so as to make clear that only uniformed guards are to be appointed as special policemen, since they are the ones who are carefully selected and trained for police service". Senate Report No. 1176.

■ It may well be that Congress specifically authorized the GSA to draw only upon the uniformed guards to serve as police officers. But the limitation to guards was, at most, intended as a means of ensuring capable personnel. The congressional purpose behind Section 318 would be subverted by requiring the GSA, at this stage, to respect the technical limitation to guards at the price of not employing qualified officers for police work.[3] We hold, therefore, that the GSA did not depart from its delegated authority when it chose to bypass the limitation to guards in favor of discharging its principal statutory duty to appoint carefully trained federal officers for the protection of federal buildings.

■ Our reading of the legislative history of Section 318 leads us to the conclusion that the plaintiffs also lack standing to seek an order against the GSA. A primary factor in deciding whether the requirement of standing is met is whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question". *Data Processing Service v. Camp,* 1970, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184. This aspect of the requirements of standing is succinctly incorporated into the mandamus statute. Section 1361 states that mandamus is proper to compel a duty "running directly to the plaintiff". In our view, Section 318 was designed to enable the GSA to discharge its duty to the public and to the government to protect federal property; the reference in the statute to the uniformed guards is merely an incident of this design. Since the statute does not impose a duty on the GSA for the benefit of the guards, we also conclude that the plaintiffs have failed to satisfy this prerequisite for mandamus relief.

■ Finally, we note that even if the plaintiffs had succeeded in showing that the GSA acted beyond the scope of its statutory power when it recruited special police from outside the ranks of the guards, we would not grant the relief sought here. This Circuit recently considered the occasions when the doctrine of sovereign immunity may prevent a court from granting an affirmative remedy. *Schlafly v. Volpe,* 7th Cir. 1974, 495 F.2d 273. Even when a suit falls within a recognized exception to that doctrine,[4] we cannot grant relief that would place "'an intolerable burden on governmental functions, outweighing any consideration of private harm'". 495 F.2d at 280. This is an appropriate consideration here, whether or not the doctrine of sovereign immunity has independent application in Section 1361 cases,[5] because of the tradi-

---

**3.** The plaintiffs also argued that the GSA, by attempting to secure legislation which would specifically authorize the FPS, has implicitly acknowledged that it acted illegally. We do not agree that the failure of Congress to pass this legislation justifies an inference of illegal activity. As the federal defendants point out, since 1971 Congress has passed a yearly appropriation act for the GSA. The GSA is permitted to use funds made available by the acts to administer both the FPS and the uniformed guards force. *See, e. g.,* Section 610 of the Treasury, Postal Service, and General Government Appropriation Act, 91 Stat. 356 (1977).

**4.** Suits against federal officers in their official capacity are nonetheless deemed to be suits against the sovereign unless the officials' actions are (1) beyond their statutory powers or (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void. *Dugan v. Rank,* 1963, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15.

**5.** The question whether sovereign immunity can deprive a court of mandamus jurisdiction continues to divide the courts. For cases holding that the doctrine of sovereign immunity

tional principle that extraordinary relief will not be granted when it causes undue hardship to the defendant or to the public. In our view, the probability that the public would be harmed as a result of an order compelling the GSA to rely solely on the uniformed guards to perform all special protective duties justifies dismissal of this portion of the plaintiffs' complaint.[6]

### III.

We turn now to the plaintiffs' request for reclassification as FPS officers. In Count II of the complaint the plaintiffs state that the refusal of the GSA and Civil Service Commission to appoint them to the higher grade position was wrongful for two reasons. First, the plaintiffs insist that the physical examination imposed on the guards was an improper barrier to their promotion because rigorous physical fitness standards are not necessary for the effective performance of the duties of an FPS officer. The plaintiffs allege, for example, that the GSA

has hired FPS officers in regions other than Chicago who suffer from disabilities similar to those that disqualified the plaintiffs. Second, the guards maintain that it is improper to deny them the benefits that attach to the position of FPS officer when they already perform the duties of that position.

In support of their right to an order promoting them to the higher Grade Schedule position, the plaintiffs argue that the Examination and Selection Act, 5 U.S.C. § 3363, imposes a duty on the GSA and Civil Service Commission to waive the physical requirements for veterans requesting promotions to another position, "if, in the opinion of the Commission or other examining agency, . . . the preference eligible is physically able to perform efficiently the duties of the position".[7] Because the stated purpose of the Classification Act, 5 U.S.C. § 5101, is to provide a system whereby employees are classified in accordance with the principle of "equal pay for substantially

---

does not prevent mandamus actions to compel federal officers to perform duties imposed upon them by law, *see, e. g., Houston v. Ormes*, 1920, 252 U.S. 469, 472–74, 40 S.Ct. 369, 64 L.Ed. 667; *Clackamas County v. McKay*, 1954, 94 U.S.App.D.C. 108, 219 F.2d 479, *vacated as moot*, 1955, 394 U.S. 909, 75 S.Ct. 599, 99 L.Ed. 1244; *Knox Hill Tenant Council v. Washington*, 1971, 145 U.S.App.D.C. 122, 129, 448 F.2d 1045, 1052 n.8. Other courts, however, have observed that the mandamus statute, 28 U.S.C. § 1361, is not a consent to suit by the sovereign and, therefore, sovereign immunity can be a bar to mandamus jurisdiction. *Smith v. Grimm*, 9th Cir. 1976, 534 F.2d 1346, 1352 n.9; *White v. Administrator of General Services Administration*, 9th Cir. 1965, 343 F.2d 444; *Southport Land & Commercial Co. v. Udall*, N.D.Cal.1965, 244 F.Supp. 172.

Since sovereign immunity is not a defense for federal officials who have acted beyond statutory powers, it may be unnecessary to consider the doctrine once the similar question at issue in any mandamus case—whether the official acted outside the scope of his delegated authority—is resolved. *See* Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308, 342. In any event, plaintiffs invoking mandamus jurisdiction will usually be able to rely on Congress' waiver of sovereign immunity in the Administrative Procedure Act, 5 U.S.C. § 702.

Judicial review under the Administrative Procedure Act is also limited by the principle that extraordinary relief will not be granted when it would impose an intolerable burden on the sovereign defendant or the public. 5 U.S.C. § 702(1).

6. What we have said thus far concerning the scope of power delegated to the GSA by § 318 and the propriety of extraordinary relief also disposes of the possibility that the district court had jurisdiction to grant specific relief under 28 U.S.C. § 1331(a).

7. 5 U.S.C. § 3363 provides:

"In determining qualifications of a preference eligible for promotion to another position in the competitive service, an Executive agency, or the government of the District of Columbia, the Civil Service Commission or other examining agency shall waive—

(1) requirements as to age, height, and weight, unless the requirement is essential to the performance of the duties of the position; and

(2) physical requirements if, in the opinion of the Commission or other examining agency, after considering the recommendation of an accredited physician, the preference eligible is physically able to perform efficiently the duties of the position."

5 U.S.C. § 3363 (1970).

equal work",[8] the plaintiffs also maintain that the Civil Service Commission has a statutory duty to reclassify guards who perform the work of FPS officers. The plaintiffs claim a right to retroactive monetary relief for the period of misclassification, as well, based primarily on the Back Pay Act, 5 U.S.C. § 5596(b).[9] The district court dismissed, taking the view that the uniformed guards did not allege any infringement of their statutory rights because they continued to receive the pay for which they agreed to work.

We cavil not at the district court's dismissal of the plaintiffs' claim for relief had that claim rested solely on the theory that the GSA and the Civil Service Commission acted arbitrarily when they originally imposed strict physical prerequisites for the job of FPS officer in the Chicago region. We know of no statute that limits an agency's power to impose requirements that it believes are necessary for a particular position. Ordinarily, these decisions are not amenable to judicial control by way of mandamus or otherwise because courts are not qualified to substitute their judgment on these issues for that of an agency. Nor is the plaintiffs' bare allegation that the physical requirements were adopted at a late date in an attempt to phase out the guard force sufficient to state a claim of discriminatory treatment that would entitle them to judicial review.

A very different situation is presented when the plaintiffs also allege that, despite their physical disabilities, they currently perform the duties of the position to which they have been denied promotion. The allegations in the complaint do not merely challenge the original decision to impose stringent physical qualifications on the job of FPS officer, nor do they challenge the initial decision to classify the uniformed guards and FPS officers at two different grades. Indeed, the plaintiffs concede that the official descriptions of the two jobs differ substantially. Rather, the thrust of the plaintiffs' argument here is that, *as a factual matter*, FPS officers are not given more hazardous tasks and, therefore, there are at present no differences between the two positions. Accepting these allegations as true, we agree that they state a good claim for prospective promotion.

The Supreme Court recently observed that there is "a difference between prospective reclassification, on the one hand, and retroactive reclassification resulting in money damages, on the other." *United States v. Testan*, 1976, 424 U.S. 392, 403, 96 S.Ct. 948, 955, 47 L.Ed.2d 114, 124. The plaintiffs in that case had alleged that the duties they performed were identical with those performed by other trial attorneys who were classified at a higher GS rating. They sued in the Court of Claims for an order directing reclassification and awarding back pay.[10] In reversing the Court of Claims decision, the Supreme Court referred to the traditional rule, relied on by the district court in this case, that a federal employee "is entitled to receive only the salary of the position to which he was appointed, even though he may have performed the duties of another position or claims that he should have been placed in a higher grade". 424 U.S. at 406, 96 S.Ct. at 957, 47 L.Ed.2d at 126. Although the Court held that neither the Back Pay Act nor the Classification Act changed this rule by creating a substantive right to back pay for the period of misclassification, in a signifi-

---

**8.** In the "purpose" section of the Act, 5 U.S.C. § 5101(1)(A), Congress stated that it was "to provide a plan for classification of positions . . . [whereby] the principle of equal pay for substantially equal work will be followed . . . ." 5 U.S.C. § 5101 (1970). *See also* 5 U.S.C. § 5341(1)–(2) (Supp.IV, 1974).

**9.** The Back Pay Act authorizes retroactive recovery of wages whenever a federal employee has "undergone an unjustified or unwarranted personnel action that has resulted in the with-

drawal or reduction of all or part of" the compensation to which the employee is otherwise entitled. 5 U.S.C. § 5596(b).

The plaintiffs rely on a provision of the Tucker Act, 28 U.S.C. § 1346(a)(2), to establish jurisdiction over the back pay claim.

**10.** The attorneys premised their right to recover money damages on the Tucker Act, 28 U.S.C. § 1491; the Classification Act, 5 U.S.C. § 5101; and the Back Pay Act, 5 U.S.C. § 5596.

cant dictum concerning the scope of the plaintiffs' statutory right to equal pay for equal work under the Classification Act, the Court suggested that a "possible avenue of relief—and it, too, seemingly, is only prospective—is by way of mandamus, under 28 U.S. § 1361, in a proper federal district court". 424 U.S. at 403, 96 S.Ct. at 956, 47 L.Ed.2d at 124.

In light of the holding in *Testan*, we do not doubt that the district court properly denied the plaintiffs' request for back pay.[11] But we also read that decision as support for the plaintiffs' contention that the Classification Act grants them a substantive right to be reclassified to the position in the General Schedule scale occupied by the FPS officers, if it is true that both groups of employees now perform the same work.

██ The *Testan* Court, of course, did not expressly decide that the Classification Act requires the Civil Service Commission to compare the duties performed by the plaintiffs with those performed by other employees who are classified differently. That conclusion was implicit, however, in the Court's suggestion that the plaintiffs in *Testan*, who also complained that their classification did not square with that of other employees performing the same duties, could request prospective relief from the Civil Service Commission or a district court. And other courts have held that without such comparison, the statutory mandate of "equal pay for equal work" is "nothing more than a slogan". *Haneke v. Secretary of Health, Ed. & Welfare*, 1976, 175 U.S. App.D.C. 329, 535 F.2d 1291, 1298; *Testan v. United States*, 1974, 499 F.2d 690, 691, 205 Ct.Cl. 330, 332, *rev'd on other grounds*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114. We agree. The uniformed guards will hardly be consoled by the district court's observation in this case that they were classified properly at one time and continue to receive the pay appropriate to that classification, when they can identify others who receive more money for the same duties. Nor will it console the guards to learn that FPS officers receive more pay because the latter have passed a physical examination, when the guards are called upon to perform

---

11. We are not persuaded by the plaintiffs' efforts to rescue their claim for back pay from the bar of *Testan*. The plaintiffs allege that the GSA's failure to appoint guards as special police and the arbitrary refusal to waive physical requirements for veterans constituted "unwarranted personnel action" within the meaning of the Back Pay Act. *See* note 9 *supra*. The Supreme Court made crystal clear in *Testan*, however, that the Back Pay Act provides a monetary remedy solely to employees who are subjected to a "wrongful *reduction* in grade" or "in their duly appointed emoluments or position". *United States v. Testan*, 1976, 424 U.S. at 405–407, 96 S.Ct. at 956–957, 47 L.Ed.2d at 124–126. The uniformed guards have never been subjected to a *reduction* in grade or pay. Rather, they alleged that they were denied the benefit of a position to which they should have been but were not appointed. *See also Hill v. United States*, 9th Cir. 1978, 571 F.2d 1098, 1103.

Mr. Jarecki maintains that his case is distinguishable from that of the other uniformed guards because he was temporarily detailed to the position of FPS officer for more than 120 days. In 1974, the Appeals Review Board of the Civil Service Commission determined that whenever an agency details a federal employee to a higher graded position for more than 120 days without seeking the approval of the Civil

Service Commission, the agency must retroactively promote the employee from the 120th day until the detail expires. The failure to promote is an "unwarranted personnel action", according to the Board, thus entitling the employee to back pay. (Unpublished decision affirmed in 55 Comp.Gen. 539 (1975).)

We note in passing that the Board's definition of an "unwarranted personnel action" to encompass temporary positions and the *Testan* clarification of the meaning of this phrase are somewhat at odds. Since the Board decision antedates *Testan*, we need not accord it much weight. Moreover, even under the Board's decisions, an employee is not eligible for a temporary promotion, or back pay, unless he has served at least one year in the next lower grade. *See* "Whitten Amendment", 5 U.S.C. § 3101 (1970); 5 C.F.R. §§ 300.601–05. It appears that Mr. Jarecki has not served in the next lower grade for the required amount of time. Although the Civil Service Commission may waive the service requirement in individual cases, the decision is entirely within the discretion of the Civil Service Commission. Because the exact Commission policy concerning Mr. Jarecki's entitlement to back pay is not at all clear, we think that he should attempt to seek relief first by appealing within the Civil Service Commission.

identical work despite having failed the physical.[12]

■ Moreover Congress has provided these plaintiffs with a substantive right to prospective promotion in the Veterans Preference Act. Congress chose to encourage and reward military service by granting certain preferences to veterans who desire public employment. In 5 U.S.C. § 3363, Congress expressed its will that veterans not be denied promotions on the basis of physical requirements unless these requirements are necessary for the effective performance of the position that the veteran seeks. When a veteran alleges that he already performs the duties of the new position, we think he has placed himself clearly within the intended ambit of this legislative preference. We conclude, therefore, that the district court should not have dismissed this portion of the plaintiffs' complaint for failure to state a claim for relief.

## IV.

■ This suit is premature. None of the plaintiffs exhausted the extensive remedies provided by the Classification Act,[13] see 5 U.S.C. § 5512; 5 C.F.R. §§ 511.601 et seq., although the Civil Service Commission is more capable than the district court of resolving the question in this suit. Indeed, the Commission may eliminate the need for judicial review by identifying those duties in the police position series which qualify the FPS, but not the uniformed guards, for that classification. We caution the plaintiffs, moreover, that our review of the Commission's conclusions concerning the duties actually performed by both groups of employees is necessarily limited and is based on the agency record. See Haneke v. Secretary of Health, Ed. & Welfare, 1976, 175 U.S.App.D.C. 329, 335, 535 F.2d 1291, 1297. We hold, therefore, that those portions of the plaintiffs' complaint that state a claim for relief must be dismissed for failure to exhaust administrative remedies.

The district court's dismissal of the plaintiffs' complaint is, therefore, Affirmed.

---

**12.** In concluding that the plaintiffs have stated a good claim for prospective reclassification, we do not mean to suggest that the different physical qualifications possessed by the plaintiffs and FPS officers provide an invalid basis for classifying them in separate positions. When the duties of employees in different positions overlap but do not coincide, the Civil Service Commission may classify employees at a higher position if they perform some duties that are so different as to require materially higher qualifications which are reflected in the standards used in testing and selection. See Position-Classification Standards for Positions Subject to the Classification Act of 1949, as amended, U.S. Civil Service Commission, Bureau of Programs and Standards, Standards Division (1967) at 25–26.

This policy is neither arbitrary nor unfair. Cf. Kavazanjian v. U. S. Immigration and Naturalization Service, S.D.N.Y.1975, 399 F.Supp. 339, aff'd mem., 2 Cir., 542 F.2d 1165. It may well be that the instant case is covered by this classification policy. The plaintiffs, however, have alleged that the FPS do not perform any different or more hazardous protective duties.

**13.** Although Mr. Jarecki grieved the question whether he was required to take the physical examination to qualify as an FPS officer with the GSA, neither he nor the other plaintiffs called the attention of the Civil Service Commission to the alleged discrepancy in classification for identical work.

Our conclusion is not altered by the report of the GSA Examining Agent. The report does not provide a basis for judicial review of this case. The agent did not make specific findings concerning the present responsibilities of the FPS and the uniformed guards. Moreover, we believe that this inquiry is best conducted by the Civil Service Commission and not the GSA. We note, however, that the report mentions in passing that the duties of FPS officers and uniformed guards overlap and recommends that the guards cease performing those duties that are assigned to the FPS. A fair implication of this recommendation is that these duties are not central to the work of the guards. Were we to credit the GSA report, given the necessarily limited nature of our review, we would affirm on the merits.